ORIGINAL

EDWARD H. KUBO, JR. #2499
United States Attorney
District of Hawaii

ELLIOT ENOKI #1528
First Assistant U.S. Attorney

KENNETH M. SORENSON
Assistant U.S. Attorney
Room 6-100 PJKK, Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii   96850
Telephone:  (808) 541-2850
Facsimile:  (808) 541-2958
Email:  Ken.Sorenson@usdoj.gov

ROBERT E. WALLACE JR.
Senior Trial Attorney
United States Department of Justice
National Security Division
Counterespionage Section
1400 New York Avenue, NW
Washington, DC   20005
Telephone:  (202) 514-1187
Email:  Robert.Wallace@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

OCT 25 2007

at____o'clock and_____min.____M.
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 05-00486 HG-KSC |
| | ) | |
| Plaintiff, | ) | SECOND SUPERSEDING INDICTMENT |
| | ) | |
| vs. | ) | [18 U.S.C. §§ 794(a), 793(e), |
| | ) | 371, 1957; 22 U.S.C. |
| NOSHIR S. GOWADIA, | ) | § 2778(c); 26 U.S.C. |
| | ) | § 7206(1)] |
| Defendant. | ) | |

SECOND SUPERSEDING INDICTMENT

The Grand Jury charges:

At all times material to the Indictment:

INTRODUCTORY ALLEGATIONS

1.  Defendant NOSHIR S. GOWADIA ("Defendant GOWADIA" or "GOWADIA") was a naturalized citizen of the United States. GOWADIA was employed as an engineer by the Northrop Corporation (later known as "Northrop Grumman Corporation," hereafter "Northrop") from in or about 1968 to in or about 1986, and, in or about 1979, was assigned to a then classified Special Access Program which developed the B-2 Spirit bomber.  Specifically, GOWADIA assisted in the development of the unique propulsion system of the B-2 Spirit bomber by utilizing classified design techniques for infrared, visual and radar signature reduction which contributed to the aircraft's low observable capabilities.

2.  GOWADIA held a number of positions in various classified programs while at Northrop, most of which involved research and development of aircraft and missiles and related propulsion systems, as well as related low observable and survivability technologies.  Additionally, GOWADIA worked as a defense contractor on behalf of the United States of America through his corporate entity, Noshir S. Gowadia, Inc. (NSGI), after he separated from employment with Northrop.  In this

-2-

capacity, GOWADIA conducted classified work through contracts with the United States government.

3.    Classified information is defined by Executive Order 12958, as amended by Executive Order 13292, as information in any form that:  (1) is owned by, produced by or for, or under the control of the United States government; (2) falls within one or more of the categories set forth in Section 1.4 of the Order (including intelligence sources or methods, cryptology, military plans, weapons systems and vulnerabilities or capabilities of systems, installations, projects, or plans relating to the national security); and (3) is classified by an original classification authority who determines that its unauthorized disclosure reasonably could be expected to result in damage to the national security.  Where the unauthorized disclosure of classified information could reasonably result in "serious" damage to the national security, the information may be classified "SECRET."  Where such damage is "exceptionally grave," the information may be classified "TOP SECRET."  Certain low observable technologies are subject to additional safeguarding and access requirements as Special Access Programs.

4.    GOWADIA, in connection with his employment with Northrop on projects involving classified information, entered into several certain agreements proscribing the unauthorized

-3-

disclosure of any classified information and other information he acquired as part of his performance of his official duties at Northrop.  One specific agreement provided that:

a.  On or about January 31, 1984, GOWADIA signed a Program Security Briefing Acknowledgment and Non-Disclosure Agreement in which he acknowledged that:

. . . 1.  I have been briefed concerning the program indicated above.  Having received high[ly] classified information relating to the United States Government, I am aware that its unauthorized disclosure could seriously damage the national security.  The transmission or revelation of such information to unauthorized persons could subject me to prosecution under the Espionage Laws (Title 18, United States Code, Sections 793, 794, 798).

. . . 2.  I do solemnly swear or affirm that I will never divulge, publish, or reveal by word, conduct, or any other means, such information or knowledge except when necessary to do so in the performance of my official duties in connection with the Special Program and in accordance with the laws of the United States, unless specifically authorized in writing in each and every case by a duly authorized representative of the United States Government.

-4-

. . . 3.   I acknowledge that the information I receive is given only to persons specifically approved for the identified program and may not be further divulged without specific prior written approval from a duly authorized representative of the United States Government.   All access is restricted to "must know" based upon my present position of functional use.

Although he ceased employment with Northrop in 1986, GOWADIA signed a debriefing agreement in which he acknowledged that he had a "continuing individual responsibility to the program and to the United States Government for the protection of such information and termination of access to information concerning this program does not relieve me of my obligations under this oath or any other previously executed agreements or those imposed by law, specifically Title 18, United States Code, Sections 793, 794 and 798."

5.   In addition to NSGI, GOWADIA established, directed and controlled several corporate entities through which he sought to market defense services specific to items on the United States Munitions List to foreign persons, officials, and entities. These corporate entities were operated as a mechanism to both market defense services, and as a means of obtaining, maintaining, distributing and secreting funds related to

GOWADIA's effort to sell defense services, technical data related to significant military equipment and classified information concerning protected defense technologies.

<u>The Arms Export Control Act</u>

6.   In furtherance of the national security and foreign policy interests of the United States, the United States regulates and restricts the export of arms, munitions, implements of war, and other defense articles and services, pursuant to the Arms Export Control Act (AECA), Title 22, United States Code, Section 2778, *et seq.*

7.   The regulations which implement and govern such exports are entitled the International Traffic in Arms Regulations (ITAR), Title 22, Code of Federal Regulations, Sections 120-130.

8.   The ITAR promulgates a list of categories of defense articles and defense services which are subject to control by these regulations.  This list is called the United States Munitions List, and is found at Title 22, Code of Federal Regulations, Section 121.1.

9.   The ITAR defines "defense service" as the furnishing of assistance (including training), to foreign persons, whether in the United States or abroad in the design, development, engineering, manufacture, production, assembly,

testing, repair, maintenance, modification, operation, demilitarization, destruction, processing or use of defense articles.  The definition of defense service also includes the furnishing to foreign persons of any technical data controlled under the ITAR, whether in the United States or abroad.

10.  The ITAR defines "technical data" to include "information, other than software as defined in § 120.10(4), which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles."  The definition of the term "technical data" further includes, "classified information relating to defense articles and defense services."  Title 22, Code of Federal Regulations, Sections 120.10(1) and (2).

11.  No defense articles or defense services, or technical data related thereto, may be exported from the United States to a foreign country without first obtaining a validated license or written approval from the United States Department of State, Directorate of Defense Trade Controls.  The definition of export includes the disclosure or transfer of technical data to a foreign person, whether in the United States or abroad, or the performance of a defense service on behalf of, or for the benefit of, a foreign person, whether in the United States or abroad.

Title 22, Code of Federal Regulations, Sections 120.17(4) and (5).

12. Information concerning low observable (stealth) technologies, such as methods and techniques to reduce the infrared and radar signatures of military systems such as missiles and aircraft and their components, is specifically controlled for export in the United States Munitions List, Title 22, Code of Federal Regulations, Section 121.1. Category XIII pertaining to Auxiliary Military Equipment, defines such technologies as "hardware and equipment, which has been specifically designed or modified for military applications, that is associated with the measurement or modification of system signatures for detection of defense articles. This includes but is not limited to signature measurement equipment; prediction techniques and codes; signature materials and treatments; and signature control design methodology." Paragraph (k) of the same category provides that these export controls extend to technical data and defense services related to the defense articles listed in this category. Additionally, information concerning missile systems and components thereof is also specifically controlled for export in the United States Munitions List. Section 121.1, Category IV, pertaining to Launch Vehicles, Guide Missiles, Ballistic Missiles, Rockets, Torpedoes, Bombs and Mines, which

defines such systems as "launch vehicles and missile and antimissile systems including but not limited to guided, tactical and strategic missiles, launchers, and systems." Paragraph (h) of the same category provides that export controls extend to "all specifically designed or modified components, parts, accessories, attachments, and associated equipment for the articles in this category." Also, paragraph (i) provides that technical data and defense services directly related to the defense articles enumerated in paragraphs (a) through (h) of this category are also controlled for export. Furthermore, Section 121.1, Categories IV and XIII, provide that all defense articles, technical data and defense services related to low observable technologies described above are considered to be Significant Military Equipment as that term is defined in Section 120.7.

<u>COUNT 1</u>

<u>Conspiracy</u>

[18 U.S.C. § 371]

The Grand Jury charges:

13.   The Grand Jury realleges and incorporates as though set forth in full herein paragraphs 1 through 12 of the Introductory Allegations of this Superseding Indictment.

14.   Beginning in or about January 2002, the exact date being unknown to the Grand Jury, and continuing to on or about

late January 2006, in the District of Hawaii and elsewhere,

NOSHIR S. GOWADIA, the defendant, unlawfully conspired,

confederated, and agreed with unindicted Co-conspirators Tommy

Wong, a/k/a: "Wong Tong-ming," "Wang Dongming" ("Wong"), Henri

Nyo, a/k/a: "Hwie Let Nyo," "Henri Njoo" ("Nyo") and other

persons known and unknown to the Grand Jury, to knowingly and

willfully export defense services and technical data, to include

classified information relating to defense articles and defense

services, to the People's Republic of China (PRC), without having

first obtained a validated license or written approval from the

United States Department of State, Directorate of Defense Trade

Controls, in violation of Title 22, United States Code, Section

2778; and Title 22, Code of Federal Regulations, Sections 125.1,

125.2, 125.3, 126.1, 127.1 and 127.3.

<u>MANNER AND MEANS OF THE CONSPIRACY</u>

15.   In order to achieve the objects of the conspiracy,

GOWADIA, Nyo and others known and unknown, initiated contact with

representatives of the PRC for the purpose of marketing

controlled defense technologies related to the reduction of the

infrared heat signatures of aircraft and airborne weapons

systems.  As a part of their conspiracy, GOWADIA and Nyo intended

to market and sell GOWADIA's expertise and knowledge derived from

his work on the B-2 bomber program and other classified United

States government projects on which GOWADIA worked or had access to while employed at Northrop and subsequently as a United States defense contractor.

16.   As a further part of the conspiracy, GOWADIA would and did travel to the PRC on at least six (6) occasions between July 2003 and June 2005 for the purpose of meeting with Wong and representatives and technical engineers of the PRC, and others, in order to disclose to officials of the People's Republic of China technical defense data and provide defense services.  The defense services performed were in the form of design, test support and test data analysis of advanced propulsion system technologies and low observable technologies for the specific purpose of assisting the PRC in designing, testing and analyzing a low observable exhaust nozzle, optimized for significant reduction in the infrared heat signature, for a PRC cruise missile.

17.   As a further part of their unlawful plan, GOWADIA and Wong would and did create and utilize covert e-mail addresses to communicate and deliver classified national defense information and other protected defense information and defense services related to the development of a low observable exhaust nozzle for a PRC cruise missile.

18.   As a further part of the conspiracy, GOWADIA and Nyo were paid moneys by Wong and other representatives of the PRC for work conducted by GOWADIA in the design, development, testing, and analysis of a low observable exhaust nozzle, optimized for significant reduction in the infrared heat signature, for a PRC cruise missile.  GOWADIA was paid approximately $110,000 United States Dollars ("USD") by representatives of the PRC for his assistance.

19.   It was further part of the conspiracy that GOWADIA and Wong would and did conceal and secret the frequency, duration and destination of GOWADIA's travel to the PRC by at various times failing to stamp, or making false and misleading stamps, in GOWADIA's passport to conceal his entry into and exit out of Hong Kong and mainland China, thereby secreting GOWADIA's entry into mainland China.  In addition, in order to further conceal GOWADIA's destinations in mainland China, Wong paid for expenses incurred by GOWADIA during his presence there.

20.   It was a further part of the conspiracy that GOWADIA would and did contact Wong and other officials of the PRC by telephone and the Internet for the purpose of communicating classified information related to the national defense as well as other protected technical data and defense services related to defense articles.

OVERT ACTS

In furtherance of the conspiracy and in order to effect the objects thereof, GOWADIA, unindicted coconspirators Wong and Nyo, and others known and unknown to the Grand Jury, did commit overt acts, including, but not limited to, those described below.

21.   In or about June 2003, GOWADIA exchanged a series of emails with Nyo in which they planned and coordinated a trip to Chengdu city, Sichuan Province, PRC.

22.   In or about July 2003, GOWADIA and Nyo traveled to Hong Kong to meet with Wong, who worked for the PRC government's Foreign Experts Bureau (also known as the State Bureau of Foreign Experts), and others unknown, in order to market GOWADIA's expertise in advanced propulsion systems and low observable technologies.

23.   On or about July 28, 2003, Wong accompanied GOWADIA and Nyo in entering mainland China from Hong Kong at Shenzhen, in the Guangdong Province of PRC.

24.   On or about July 29, 2003, GOWADIA, Nyo, and Wong traveled to the city of Chengdu, in the Sichuan Province in the central part of the PRC, a center for research and development of Chinese fighter aircraft and cruise missiles.

25.   On or about July 31, 2003, GOWADIA delivered an oral presentation, supported by a PowerPoint presentation file

-13-

named "AdvancedExhaustSystems-AeroDPB31Jul03(1).ppt," to representatives of the PRC in which he communicated information concerning advanced propulsion exhaust systems and related low observable technologies which information and technical data related to the national defense and was classified at the SECRET level.

26.  On or about August 7, 2003, GOWADIA received $15,000 from Nyo as payment for GOWADIA's presentation of information to representatives of the PRC.

27.  On or about August 12, 2003, GOWADIA returned to Hawaii from the PRC in possession of the $15,000, which he falsely represented to United States Customs and Border Protection officials were funds intended to be used to purchase an antique desk overseas.

28.  Between August 8, 2003 and August 29, 2003, GOWADIA exchanged a series of emails with Wong in which they negotiated specific payment amounts for Gowadia's work on the PRC project.  Additionally, GOWADIA asked Wong what computer-aided design (CAD) software was used by the PRC, and in what file format did the PRC want data.  GOWADIA informed Wong that he used a CAD program called "Solidworks."  Wong subsequently provided the information requested.

29.  On or about August 30, 2003, GOWADIA received an e-mail from Wong describing information that the PRC representatives wanted to obtain from GOWADIA and Wong before they would commit to funding the project.  Wong indicated that if the PRC customer agreed to go forward "they will sent someone meet u again with me next trip to discuss the detail what u design and their requirement."

30.  On or about October 26, 2003, GOWADIA made his second trip to the PRC.  GOWADIA arrived in Hong Kong, traveled to Shenzen, Guangdong province, PRC, and participated in a meeting with representatives of the PRC, including Wong and others, where he was shown test data for a PRC exhaust nozzle. GOWADIA provided his assessment of this data and offered suggestions to correct design problems.  At this meeting, GOWADIA and the PRC representatives also discussed his proposal to design and assist in the development of a low observable exhaust nozzle optimized for infrared signature reduction for a PRC cruise missile.

31.  On or about November 17, 2003, Wong sent an e-mail to GOWADIA in response to his proposed nozzle development and its associated costs.  Wong expressed concern that the costs were significantly higher than GOWADIA's previous verbal estimates.

-15-

32.   On or about November 29, 2003, Wong sent an e-mail to GOWADIA indicating that he must reduce the price.  The e-mail contained the text of a previous e-mail sent by GOWADIA which provided justification for the costs quoted to the PRC, stating, "[t]here is a lot of work required, many iterations, to make a design for a real system."

33.   On or about December 21, 2003, GOWADIA transmitted by e-mail a file named "NSGIcapabilities.ppt" to Wong, in his capacity as a representative of the PRC, which contained information classified at the SECRET level.  In an accompanying email, GOWADIA stated:  "I have attached my capability document which we had to prepare ... for a program.  Thought you could use it.  Not many people have this strong a resume.  I am not sure your people appreciate it, maybe just think I am like any other expert."

34.   On or about April 15, 2004, GOWADIA prepared an invoice for Wong for the sum of $19,500 USD, billing the PRC for work completed to date on the low observable exhaust nozzle for the PRC cruise missile project.

35.   On or about April 19, 2004, GOWADIA made his third trip to the PRC.  GOWADIA took a flight from Honolulu to Hong Kong to meet again with PRC representatives.

-16-

36.  On or about April 20, 2004, GOWADIA arrived in Hong Kong to meet with PRC representatives to discuss GOWADIA's proposal to develop a low observable exhaust nozzle optimized for infrared signature reduction for a PRC cruise missile.

37.  On or about April 21, 2004, Wong escorted GOWADIA into mainland China through PRC border personnel, and arranged for GOWADIA to enter mainland China without having his passport stamped.

38.  On or about April 22, 2004, GOWADIA met with engineers and other representatives of the PRC in Shenzen and discussed low observable exhaust nozzle design issues for the PRC cruise missile.  During this meeting, PRC engineers provided GOWADIA with PRC cruise missile system requirements and nozzle data for the real PRC cruise missile, for which they wanted GOWADIA's assistance in designing a new, low observable exhaust nozzle.  GOWADIA took this information back with him to Hawaii.

39.  At the April 2004 Shenzen meeting, GOWADIA directed Wong to wire money to his Ntech Establishment bank account at UBS in Switzerland for payment of defense services provided by GOWADIA to the PRC.

40.  On or about April 24, 2004, GOWADIA sent an invoice to his corporation, Ntech Establishment, for the sum of $20,000, for defense services completed on behalf of "Hong Kong

-17-

Investors," which was GOWADIA's coded billing designation for work completed on behalf of the PRC.

41.   Between April 22, 2004 and June 18, 2004, GOWADIA, using the data provided by the PRC engineers during his previous trip, designed a low observable exhaust nozzle optimized for reduced infrared heat signature for the PRC cruise missile. GOWADIA stored numerous images of the nozzle design on his personal computer.   GOWADIA used a computer code (NoshIR) he created in or about 1993 for predicting infrared signatures of aircraft and missiles, to predict the infrared signature of the PRC cruise missile modified with the low observable nozzle he designed and to analyze the lock-on range of the so modified PRC cruise missile against an Air to Air missile of the United States.   GOWADIA set forth this data in a PowerPoint presentation file named "studyresults.ppt" which he entitled "Study 1."

42.   On or about June 22, 2004, GOWADIA made his fourth trip to the PRC to meet with engineers and other PRC representatives concerning the low observable exhaust nozzle he designed for the PRC cruise missile.   Upon his departure from Hawaii to travel to the PRC on June 18, 2004, GOWADIA had in his possession a PowerPoint presentation file named "studyresults.ppt" entitled "Study 1," which contained information relating to the national defense classified at the

-18-

SECRET level.  GOWADIA also had in his possession hand-drawn sketches of the low observable exhaust nozzle.

43.  On or about June 23, 2004, GOWADIA traveled to Beijing, China with Wong and visited an aeronautical testing facility.  GOWADIA was given a tour of the facility where the testing of the nozzles would be conducted.  During the tour, GOWADIA identified design flaws and technical deficiencies with the PRC's measurement capabilities.  After the tour, GOWADIA gave an oral presentation to PRC representatives using the above-described PowerPoint presentation file named "studyresults.ppt" which he entitled "Study 1" which contained information relating to the national defense, and which was classified at the SECRET level.

44.  On or about August 10, 2004, GOWADIA sent an e-mail to Wong to which was attached a document entitled "Test Plan-August 10, 2004.doc".  In this document, GOWADIA identified the specific testing processes, data collection methods and test data analysis methodology that he and the PRC engineers would use throughout the development of the low observable exhaust nozzle.

45.  On or about November 27, 2004, GOWADIA traveled to Hong Kong to meet with representatives of the PRC and then traveled to Beijing and observed the actual testing of the low observable exhaust nozzle.

46.   On or about November 28, 2004, Wong escorted GOWADIA covertly into mainland China without having his entry documented or passport stamped.

47.   On or about November 29, 2004, GOWADIA traveled to Beijing with Wong to visit the same aeronautical testing facility GOWADIA had previously visited in or about June 2004.  GOWADIA provided technical advice, assistance and design expertise to PRC engineers regarding the testing of a ½ scale model of both the original PRC exhaust nozzle as well as the low observable exhaust nozzle designed by GOWADIA.

48.   On or about January 20, 2005, Wong transmitted an e-mail to GOWADIA which attached a compressed computer ZIP file containing technical data files which contained the measured pressure and temperature data collected during the PRC's testing of GOWADIA's low observable exhaust nozzle design which occurred in or about November 2004.

49.   Between January 23, 2005 and February 6, 2005, GOWADIA and Wong exchanged a series of e-mails concerning the test data.  GOWADIA provided insight into the results of his analysis of the test data, indicating in an e-mail to Wong that "so far results look very good.  Just like predicted, temperature of the new one drops very fast as compared to the old one.  This is good."

-20-

50.   On or about February 22, 2005, GOWADIA transmitted to Wong an e-mail to which he attached a PowerPoint file named "Analysis of the Shape on the Flow Field.ppt".   This document summarized GOWADIA's analysis of the test results and contained information relating to the national defense classified at the SECRET level.

51.   On or about March 5, 2005, GOWADIA transmitted to Wong an e-mail in which he responded to questions from and conclusions of the PRC engineers from their analysis of the data. GOWADIA's response provided the future direction of the project, stating that "[t]he separation on the center cone is for the round (original) nozzle, for the rectangular nozzle due to the change in flow field the separation is not there.   No need to change the rectangular nozzle."

52.   On or about March 20, 2005, GOWADIA transmitted an e-mail to Wong to which he attached a computer file named "Answers - 20 Mar 05.doc."   In this e-mail, GOWADIA responded to specific questions from PRC representatives transmitted to him from Wong by e-mail on or about March 18, 2005.   GOWADIA provided his prediction concerning the PRC cruise missile's infrared signature and lock-on range against a United States' air-to-air missile.   This document contained information relating to the national defense classified at the SECRET level.

-21-

53.   Between March 21, 2005 and June 13, 2005, GOWADIA and Wong exchanged a series of emails in which GOWADIA and Wong discussed issues surrounding GOWADIA's demands for payment from the PRC.

54.   On or about May 9, 2005, Wong transmitted an e-mail to GOWADIA indicating that GOWADIA would be paid an additional $20,000 USD for his services to the PRC.

55.   On or about June 13, 2005, Wong transmitted an e-mail to GOWADIA informing him that the PRC's computational fluid dynamic ("CFD") analysis of GOWADIA's low observable exhaust nozzle revealed significant problems with the nozzle's predicted functional performance.

56.   On or about June 18, 2005, GOWADIA transmitted, in response to the aforementioned e-mail, a document entitled "CFD Analysis of Nozzle" in which he provided a detailed explanation of why the PRC's analysis and conclusions concerning the performance of the low observable exhaust nozzle were incorrect.

57.   On or about June 22, 2005, GOWADIA transmitted an e-mail to Wong further explaining why the PRC's analysis and conclusions concerning the performance of the low observable exhaust nozzle were incorrect, stating that "I will have to explain it in person."

58.  On or about June 25, 2005, GOWADIA traveled for
the sixth time to the PRC to meet with Wong and PRC engineers.
During this trip, GOWADIA gave an oral presentation to PRC
engineers, supported by the PowerPoint file named "Analysis of
the Shape on the Flow Field.ppt".  This document summarized
GOWADIA's analysis of the test results and contained information
relating to the national defense classified at the SECRET level.

59.  Between late June 2005 and October 2005, GOWADIA
and Wong exchanged a series of e-mails concerning GOWADIA's
ongoing efforts at assisting the PRC in the development of the
low observable exhaust nozzle for the PRC cruise missile.  On
July 18, 2005, GOWADIA transmitted an e-mail to Wong stating
that, "I am sure the new geometry will not have adverse effect on
the engine operation."

60.  On or about September 13, 2005, GOWADIA
transmitted an e-mail to Wong offering for sale a computer code
developed by GOWADIA, which he named the "NoshIR code" which
would enable the PRC to conduct its own infrared signature
predictions and lock-on range analysis.

61.  On or about October 1, 2005, GOWADIA transmitted
an e-mail to Wong containing further analysis conducted by
GOWADIA on the test data.  Regarding his final analysis of the
test data for the low observable exhaust nozzle for the PRC

-23-

cruise missile, GOWADIA provided his assessment of the nozzle's effect on performance parameters such as thrust, fuel consumption and bypass ratio, and stated, "Go ahead and test article full scale.  Please let me know the results."

62.   Between January 12, 2006 and January 27, 2006, a person using a computer located at the static Internet Protocol ("IP") address of Henri Nyo, accessed one of GOWADIA's e-mail accounts.  Following this access, e-mail communications between Nyo, Wong and GOWADIA were deleted from this e-mail account.

All in violation of Title 18, United States Code, Section 371.

<u>COUNT 2</u>

<u>Arms Export Control Act</u>

[22 U.S.C. § 2778(c)]

The Grand Jury further charges:

63.   The Grand Jury realleges and incorporates as though set forth in full herein paragraphs 1 through 12, and 15 through 62 of Count 1 of this Second Superseding Indictment.

64.   Beginning in or about June 2003, the exact date being unknown to the Grand Jury, and continuing to on or about October 13, 2005, in the District of Hawaii and elsewhere, NOSHIR S. GOWADIA, the defendant, did knowingly and willfully export a defense service and related technical data to the People's

-24-

Republic of China, to wit, the design, development, testing, and analysis of an exhaust nozzle, optimized for significant reduction in the infrared heat signature, for a PRC cruise missile, without having first obtained a validated license or written approval from the Department of State, Directorate of Defense Trade Controls.

All in violation of Title 22, United States Code, Section 2778; and Title 22, Code of Federal Regulations, Sections 125.1, 125.2, 125.3, 126.1, 127.1 and 127.3.

<u>COUNT 3</u>

<u>Communicating National Defense Information
to Person Not Entitled to Receive it.</u>

[18 U.S.C. § 793(e)]

The Grand Jury further charges:

65.   The Grand Jury realleges and incorporates as though set forth in full herein paragraphs 1 through 5, 15 through 20, and 22 through 26 of Count 1 of this Second Superseding Indictment.

66.   On or about July 13, 2003, in the District of Hawaii and elsewhere, NOSHIR S. GOWADIA, the defendant, having unauthorized possession of, access to and control over information relating to the national defense, and having reason to believe that such information could be used to the injury of

-25-

the United States and to the advantage of any foreign nation, did
willfully communicate, deliver, and transmit information relating
to the national defense to a person not entitled to receive it,
in that GOWADIA emailed a document to Henri Nyo, a/k/a:  "Hwie
Let Nyo", "Henri Njoo" ("Nyo"), at an email address associated
with Nyo, which consisted of a PowerPoint presentation GOWADIA
created and named "Advanced Exhaust Systems Aero DPB 31
Jul03.ppt," in which GOWADIA disclosed information concerning
advanced propulsion systems and related low observable
technologies, which information related to the national defense
and was classified at the SECRET level.

All in violation of Title 18, United States Code,
Sections 793(e) and 2.

### COUNT 4

Communicating National Defense Information
to Person Not Entitled to Receive it.

[18 U.S.C. § 793(e)]

The Grand Jury further charges:

67.  The Grand Jury realleges and incorporates as
though set forth in full herein paragraphs 1 through 5, 15
through 20, and 22 through 26 of Count 1 of this Second
Superseding Indictment.

68.  On or about July 31, 2003, in the District of Hawaii and elsewhere, NOSHIR S. GOWADIA, the defendant, having unauthorized possession of, access to and control over information relating to the national defense, and having reason to believe that such information could be used to the injury of the United States and to the advantage of any foreign nation, did willfully communicate, deliver, and transmit information relating to the national defense to a person not entitled to receive it, in that GOWADIA delivered an oral presentation to PRC agents and representatives, which was supported by a PowerPoint presentation GOWADIA created and named "AdvancedExhaustSystems-AeroDPB31Jul03(1).ppt," in which GOWADIA disclosed information concerning advanced propulsion systems and related low observable technologies, which information related to the national defense and was classified at the SECRET level.

All in violation of Title 18, United States Code, Sections 793(e) and 2.

//

//

//

//

//

//

COUNT 5

Communicating National Defense Information
to Person Not Entitled to Receive it.

[18 U.S.C. § 793(e)]

The Grand Jury further charges:

69.  The Grand Jury realleges and incorporates as
though set forth in full herein paragraphs 1 through 5, 15
through 20, and 33 of Count 1 of this Second Superseding
Indictment.

70.  On or about December 21, 2003, in the District of
Hawaii and elsewhere, NOSHIR S. GOWADIA, the defendant, having
unauthorized possession of, access to and control over
information relating to the national defense, and having reason
to believe that such information could be used to the injury of
the United States and to the advantage of any foreign nation, did
willfully communicate, deliver, and transmit information relating
to the national defense to a person not entitled to receive it,
in that GOWADIA transmitted to Wong, an agent and representative
of the PRC, an e-mail to which GOWADIA attached a PowerPoint file
named "NSGIcapabilities.ppt" which contained a document he
created and named "N.S. Gowadia, Inc., Research and Development
Aerospace and Marine Technologies" which contained information

-28-

relating to the national defense which was classified at the
SECRET level.

All in violation of Title 18, United States Code,
Sections 793(e) and 2.

## COUNT 6

### Communicating National Defense Information
### to Aid a Foreign Nation

[18 U.S.C. § 794(a)]

The Grand Jury further charges:

71.   The Grand Jury realleges and incorporates as
though set forth in full herein paragraphs 1 through 5, 15
through 20, and 41 through 43 of Count 1 of this Second
Superseding Indictment.

72.   On or about June 23, 2004, in the District of
Hawaii and elsewhere, NOSHIR S. GOWADIA, the defendant, with the
intent and reason to believe that such information was to be used
to the injury of the United States and to the advantage of a
foreign government, specifically the People's Republic of China,
did knowingly and unlawfully communicate, deliver, and transmit,
to a foreign government, specifically the People's Republic of
China, and to agents, officers, employees, and representatives
thereof, directly and indirectly, information relating to the
national defense of the United States which was classified at the

-29-

SECRET level, in that GOWADIA delivered an oral presentation to PRC agents and representatives, which was supported by a PowerPoint presentation file named "studyresults.ppt" which contained a document he created and named "Study 1" in which he disclosed information concerning the application of low observable technology to the exhaust nozzle for the PRC cruise missile project, and the evaluation of the effectiveness of the redesigned nozzle.

All in violation of Title 18, United States Code, Sections 794(a) and 2.

### COUNT 7

#### Communicating National Defense Information to Aid a Foreign Nation

[18 U.S.C. § 794(a)]

The Grand Jury further charges:

73.  The Grand Jury realleges and incorporates as though set forth in full herein paragraphs 1 through 5, 15 through 20, and 50 of Count 1 of this Second Superseding Indictment.

74.  On or about February 22, 2005, in the District of Hawaii and elsewhere, NOSHIR S. GOWADIA, the defendant, with the intent and reason to believe that such information was to be used to the injury of the United States and to the advantage of a

-30-

foreign government, specifically the People's Republic of China, did knowingly and unlawfully communicate, deliver, and transmit, to a foreign government, specifically the People's Republic of China, and to agents, officers, employees, and representatives thereof, directly and indirectly, information relating to the national defense of the United States which was classified at the SECRET level, in that GOWADIA transmitted to Wong, an agent and representative of the PRC, an e-mail to which GOWADIA attached a PowerPoint file named "Analysis of the Shape on the Flow Field.ppt", which summarized GOWADIA's analysis of test results.

All in violation of Title 18, United States Code, Sections 794(a) and 2.

## COUNT 8

### Communicating National Defense Information to Aid a Foreign Nation

[18 U.S.C. § 794(a)]

The Grand Jury further charges:

75.   The Grand Jury realleges and incorporates as though set forth in full herein paragraphs 1 through 5, 15 through 20, and 52 of Count 1 of this Second Superseding Indictment.

76.   On or about March 20, 2005, in the District of Hawaii and elsewhere, NOSHIR S. GOWADIA, the defendant, with the

-31-

intent and reason to believe that such information was to be used to the injury of the United States and to the advantage of a foreign government, specifically the People's Republic of China, did knowingly and unlawfully communicate, deliver, and transmit, to a foreign government, specifically the People's Republic of China, and to agents, officers, employees, and representatives thereof, directly and indirectly, information relating to the national defense of the United States which was classified at the SECRET level, in that GOWADIA transmitted to Wong, an agent and representative of the PRC, an e-mail to which GOWADIA attached a computer file he created and named "Answers - 20 Mar 05.doc" in which he provided his infrared signature prediction of the PRC cruise missile outfitted with his modified exhaust nozzle and the associated lock-on range predictions against a United States' air-to-air missile.

All in violation of Title 18, United States Code, Sections 794(a) and 2.

//

//

//

//

//

//

COUNT 9

Communicating National Defense Information
to Person Not Entitled to Receive it.

[18 U.S.C. § 793(e)]

The Grand Jury further charges:

77.  The Grand Jury realleges and incorporates as though set forth in full herein paragraphs 1 through 5 of Count 1 of this Second Superseding Indictment.

78.  On or about October 23, 2002, in the District of Hawaii and elsewhere, NOSHIR S. GOWADIA, the defendant, having unauthorized possession of, access to and control over information relating to the national defense, and having reason to believe that such information could be used to the injury of the United States and to the advantage of any foreign nation, did willfully communicate, deliver, and transmit information relating to the national defense to a person not entitled to receive it, in that GOWADIA faxed to a foreign government official in Switzerland a document setting forth a proposal to develop infrared reduction technology for the TH-98 Eurocopter which contained information concerning a defense system of the United States which was classified at the TOP SECRET level.

All in violation of Title 18, United States Code, Sections 793(e) and 2.

-33-

COUNT 10

Communicating National Defense Information
to Person Not Entitled to Receive it.

[18 U.S.C. § 793(e)]

The Grand Jury further charges:

79.  The Grand Jury realleges and incorporates as
though set forth in full herein paragraphs 1 through 5 of Count 1
of this Second Superseding Indictment.

80.  On or about November 22, 2004, in the District of
Hawaii and elsewhere, NOSHIR S. GOWADIA, the defendant, having
unauthorized possession of, access to and control over
information relating to the national defense, and having reason
to believe that such information could be used to the injury of
the United States and to the advantage of any foreign nation, did
willfully communicate, deliver and transmit information relating
to the national defense to a person not entitled to receive it,
in that GOWADIA sent an e-mail to a foreign business person in
Israel to which he attached a PowerPoint presentation concerning
a proposal to develop infrared reduction technology for foreign
commercial aircraft which contained information concerning a
defense system of the United States, which was classified at the
Secret level.

-34-

All in violation of Title 18, United States Code, Sections 793(e) and 2.

### COUNT 11

#### Communicating National Defense Information to Person Not Entitled to Receive it.

[18 U.S.C. § 793(e)]

The Grand Jury further charges:

81. The Grand Jury realleges and incorporates as though set forth in full herein paragraphs 1 through 5 of Count 1 of this Second Superseding Indictment.

82. On or about September 6, 2004, in the District of Hawaii and elsewhere, NOSHIR S. GOWADIA, the defendant, having unauthorized possession of, access to and control over information relating to the national defense, and having reason to believe that such information could be used to the injury of the United States and to the advantage of any foreign nation, did willfully communicate, deliver and transmit information relating to the national defense to a person not entitled to receive it, in that GOWADIA sent an e-mail to a foreign business person in Germany setting forth a proposal to develop infrared reduction technology for a foreign commercial aircraft which contained information concerning a defense system of the United States which was classified at the Top Secret level.

-35-

All in violation of Title 18, United States Code, Sections 793(e) and 2.

COUNT 12

Arms Export Control Act

[22 U.S.C. § 2778(c)]

The Grand Jury further charges:

83.  The Grand Jury realleges and incorporates as though set forth in full herein paragraphs 1 through 12 of Count 1 of this Second Superseding Indictment.

84.  On or about October 23, 2002, in the District of Hawaii and elsewhere, Defendant NOSHIR S. GOWADIA, did knowingly and willfully export and attempt to export classified technical data, in that GOWADIA faxed to a foreign government official in Switzerland a document setting forth a proposal to develop infrared reduction technology for the TH-98 Eurocopter which contained technical data and information concerning a defense system of the United States which is classified at the TOP SECRET level, without having first obtained a validated license or written approval from the United States Department of State, Directorate of Defense Trade Controls in violation of Title 22, United States Code, Section 2778; Title 22, Code of Federal Regulations, Sections 125.1, 125.2, 125.3, 127.1 and 127.3; and Title 18, United States Code, Section 2.

-36-

COUNT 13

Arms Export Control Act

[22 U.S.C. § 2778(c)]

The Grand Jury further charges:

85.  The Grand Jury realleges and incorporates as though set forth in full herein paragraphs 1 through 12 of Count 1 of this Second Superseding Indictment.

86.  On or about November 22, 2004, in the District of Hawaii and elsewhere, Defendant NOSHIR S. GOWADIA, did knowingly and willfully export and attempt to export classified technical data, in that GOWADIA sent an e-mail to a foreign business person in Israel to which he attached a PowerPoint presentation concerning a proposal to develop infrared reduction technology for foreign commercial aircraft which contained information concerning a defense system of the United States, which is classified at the SECRET level, without having first obtained a validated license or written approval from the United States Department of State, Directorate of Defense Trade Controls in violation of Title 22, United States Code, Section 2778; Title 22, Code of Federal Regulations, Sections 125.1, 125.2, 125.3, 127.1 and 127.3; and Title 18, United States Code, Section 2.

COUNT 14

Arms Export Control Act

[22 U.S.C. § 2778(c)]

The Grand Jury further charges:

87.  The Grand Jury realleges and incorporates as though set forth in full herein paragraphs 1 through 12 of Count 1 of this Second Superseding Indictment.

88.  On or about September 6, 2004, in the District of Hawaii and elsewhere, Defendant NOSHIR S. GOWADIA, did knowingly and willfully export and attempt to export classified technical data, in that GOWADIA sent an e-mail to a foreign business person in Germany setting forth a proposal to develop infrared reduction technology for a foreign commercial aircraft which contained technical data and information concerning a defense system of the United States which is classified at the Top Secret level, without having first obtained a validated license or written approval from the United States Department of State, Directorate of Defense Trade Controls in violation of Title 22, United States Code, Section 2778; Title 22, Code of Federal Regulations, Sections 125.1, 125.2, 125.3, 127.1 and 127.3; and Title 18, United States Code, Section 2.

//

//

COUNT 15

Unlawful Retention of National Defense Information

[18 U.S.C. § 793(e)]

The Grand Jury further charges:

89.  The Grand Jury realleges and incorporates as though set forth in full herein paragraphs 1 through 5 of Count 1 of this Second Superseding Indictment.

90.  On or about October 13, 2005, in the District of Hawaii, NOSHIR S. GOWADIA, the defendant, having unauthorized possession of, access to and control over documents, writings, sketches, blueprints, plans, models, instruments, and notes relating to the national defense, did willfully retain documents, writings, sketches, blueprints, plans, models, instruments and notes relating to the national defense and fail to deliver the same to an officer and employee of the United States entitled to receive it, in that GOWADIA retained in his residence in Maui County, Hawaii, documents, writings, sketches, blueprints, plans, models, instruments, and notes, which were marked as containing, and which did in fact contain, information relating to defense systems of the United States, classified at the SECRET level, to wit:

(a)  A single undated chart entitled "Increased Exposure in Frontal Sector" with Secret classification markings.

-39-

The chart has three graphs which contained susceptibility and vulnerability data of an aircraft against surface to air missiles.

(b)   An undated chart entitled "High Bypass Ratio Turbofan engine Measured IR Signature" with Secret classification markings.  This chart contained infrared signature levels for three different configurations of a military aircraft engine which was modified to reduce its infrared signature.

(c)   An undated chart entitled "Typical CFM-56 engine IR Signatures" with Secret classification markings removed.  This chart contained signature levels for a baseline CFM-56 engine and two configurations of the engine modified for infrared signature reductions.

(d)   An undated chart entitled "F404-400 IR Signature and Contributors" with Secret classification markings. This chart contained infrared signature data, to include the component contributions to the overall infrared signature.

(e)   Two undated pages, each of which contained a hand-traced graph without classification markings or titles. The graphs depicted specific data concerning the performance and effectiveness of infrared flares.

-40-

(f)   A single page with one hand-traced graph without
      classification markings or titles, which contained
      specific data concerning the performance and
      effectiveness of U.S. air to air missiles and flares.

(g)   Multiple sheets of trace paper with hand-traced graphs.
      Each sheet contained a portion of each of the graphs
      which, when the two sheets were superimposed, the
      resulting graphs revealed specific data concerning U.S.
      defense systems.  Specifically, graph number 27
      contained specific data concerning the sensor
      performance data against various target infrared
      signatures and related sensor specifications for a
      U.S. air to air missile system.

(h)   A computer file (hereinafter designated "File A") into
      which GOWADIA inserted portions of an U.S. Air Force
      report concerning data tables for the radar cross
      section of major defense weapons systems, specifically,
      the B1-B, F-15E, and the Air Launched Cruise Missile.

(i)   A password-protected computer file (hereinafter
      designated "File B") last modified on or about
      April 24, 1995, which contained:  a compilation of
      specific functional performance specification data,
      test data, capabilities, deficiencies, vulnerabilities,

and infrared and radar cross section data of U.S. major

defense systems and articles which were still in use,

specifically, U.S. aircraft, air to air missiles, man-

portable surface to air missiles, infrared jammer and

flare systems; and classified information related to

foreign missile threats systems, which was derived from

U.S. classified sources.

All in violation of Title 18, United States Code,

Sections 793(e) and 2.

COUNT 16

Money Laundering

[18 U.S.C. § 1957]

The Grand Jury further charges:

91.   The Grand Jury realleges and incorporates as

though set forth in full herein paragraphs 1 through 12, and 21

through 62 of Count 1 of this Second Superseding Indictment.

92.   On or about March 15, 2004, in the District of

Hawaii, and elsewhere, NOSHIR S. GOWADIA, the defendant, did

knowingly engage in a monetary transaction by, through or to a

financial institution, affecting interstate and foreign commerce,

in criminally derived property of a value greater than $10,000,

that is, the deposit of funds in the amount of $24,980 into the

City Bank business savings account of N.S. Gowadia, Inc., in

-42-

Kihei, Hawaii, such property having been derived from a specified

unlawful activity, to wit:  the knowing and willful export of a

defense service to the People's Republic of China without first

obtaining a validated license or written approval from the

Department of State, Directorate of Defense Trade Controls in

violation of Title 22, United States Code, Section 2778; and

Title 22, Code of Federal Regulations, Sections 125.1, 125.2,

125.3, 126.1, 127.1 and 127.3, as charged in Count 2 of this

Second Superseding Indictment.

        All in violation of Title 18, United States Code,

Sections 1957 and 2.

<u>COUNT 17</u>

<u>Money Laundering</u>

[18 U.S.C. § 1957]

The Grand Jury further charges:

        93.  The Grand Jury realleges and incorporates as

though set forth in full herein paragraphs 1 through 12, and 21

through 62 of Count 1 of this Second Superseding Indictment.

        94.  On or about May 14, 2004, in the District of

Hawaii, and elsewhere, NOSHIR S. GOWADIA, the defendant, did

knowingly engage in a monetary transaction by, through or to a

financial institution, affecting interstate and foreign commerce,

in criminally derived property of a value greater than $10,000,

that is the deposit of funds in the amount of $19,985, into the
City Bank business savings account of N.S. Gowadia, Inc., in
Kihei, Hawaii, such property having been derived from a specified
unlawful activity, to wit:  the knowing and willful export of a
defense service to the People's Republic of China without first
obtaining a validated license or written approval from the
Department of State, Directorate of Defense Trade Controls in
violation of Title 22, United States Code, Section 2778; and
Title 22, Code of Federal Regulations, Sections 125.1, 125.2,
125.3, 126.1, 127.1 and 127.3, as charged in Count 2 of this
Second Superseding Indictment.

All in violation of Title 18, United States Code,
Sections 1957 and 2.

<u>COUNT 18</u>

<u>Money Laundering</u>

[18 U.S.C. § 1957]

The Grand Jury further charges:

95.  The Grand Jury realleges and incorporates as
though set forth in full herein paragraphs 1 through 12, and 21
through 62 of Count 1 of this Second Superseding Indictment.

96.  On or about August 3, 2004, in the District of
Hawaii, and elsewhere, NOSHIR S. GOWADIA, the defendant, did
knowingly engage in a monetary transaction by, through or to a

-44-

financial institution affecting interstate and foreign commerce
in criminally derived property of a value greater than $10,000,
that is, the deposit of funds in the amount of $19,980 into the
City Bank business savings account of N.S. Gowadia, Inc., in
Kihei, Hawaii, such property having been derived from a specified
unlawful activity, to wit:  the knowing and willful export of a
defense service to the People's Republic of China without first
obtaining a validated license or written approval from the
Department of State, Directorate of Defense Trade Controls in
violation of Title 22, United States Code, Section 2778; and
Title 22, Code of Federal Regulations, Sections 125.1, 125.2,
125.3, 126.1, 127.1 and 127.3, as charged in Count 2 of this
Second Superseding Indictment.

All in violation of Title 18, United States Code,
Sections 1957 and 2.

### COUNT 19

#### Money Laundering

[18 U.S.C. § 1957]

The Grand Jury further charges:

97.  The Grand Jury realleges and incorporates as
though set forth in full herein paragraphs 1 through 12, and 21
through 62 of Count 1 of this Second Superseding Indictment.

98.  On or about August 16, 2004, in the District of Hawaii, and elsewhere, NOSHIR S. GOWADIA, the defendant, did knowingly engage in a monetary transaction by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, the deposit of funds in the amount of $29,980, into the City Bank business savings account of N.S. Gowadia, Inc., in Kihei, Hawaii, such property having been derived from a specified unlawful activity, to wit:  the knowing and willful export of a defense service to the People's Republic of China without first obtaining a validated license or written approval from the Department of State, Directorate of Defense Trade Controls in violation of Title 22, United States Code, Section 2778; and Title 22, Code of Federal Regulations, Sections 125.1, 125.2, 125.3, 126.1, 127.1 and 127.3, as charged in Count 2 of this Second Superseding Indictment.

All in violation of Title 18, United States Codes, Sections 1957 and 2.

//

//

//

//

//

-46-

COUNT 20

Filing a False Tax Return

[26 U.S.C. § 7206(1)]

The Grand Jury further charges that:

99.   On or about April 15, 2002, in the District of Hawaii, Defendant NOSHIR S. GOWADIA, a resident of Kihei, Hawaii, did willfully make and subscribe a Form 1040 U.S. Individual Income Tax Return for the calendar year 2001, which was filed with the Internal Revenue Service and was false as to a material matter and verified by a written declaration that was made under the penalties of perjury, which said income tax return NOSHIR S. GOWADIA did not believe to be true and correct as to every material matter in that his income tax return reported total income in the amount of $39,985.00, whereas GOWADIA knew well and believed that his total income was substantially in excess of that reported amount.

All in violation of Title 26, United States Code, Section 7206(1).

//

//

//

//

//

-47-

COUNT 21

Filing a False Tax Return

[26 U.S.C. § 7206(1)]

The Grand Jury further charges that:

100.   On or about April 15, 2003, in the District of Hawaii, Defendant NOSHIR S. GOWADIA, a resident of Kihei, Hawaii, did willfully make and subscribe a Form 1040 U.S. Individual Income Tax Return for the calendar year 2002, which was filed with the Internal Revenue Service and was false as to a material matter and verified by a written declaration that it was made under the penalties of perjury, which said income tax return NOSHIR S. GOWADIA did not believe to be true and correct as to every material matter in that his income tax return reported total income in the amount of $97,743.00, whereas GOWADIA knew well and believed that his total income was substantially in excess of that reported amount.

All in violation of Title 26, United States Code, Section 7206(1).

**FORFEITURE NOTICE**

**MONEY LAUNDERING**

101.   Pursuant to Title 18, United States Code, Section 982(a)(1), a defendant who is convicted of one or more of the

-48-

offenses set forth in Counts 15 through 18 shall forfeit to the United States the following property:

a.   All right, title and interest in any and all property involved in each offense in violation of Title 18, United States Code, Section 1957, for which the defendant is convicted, and all property traceable to such property, including the following:  (1) all money or other property that was the subject of each transaction, transportation, transmission or transfer in violation of Section 1957; (2) all commissions, fees and other property constituting proceeds obtained as a result of those violations; and (3) all property used in any manner or part to commit or to facilitate the commission of those violations.

b.   A sum of money equal to the total amount of money involved in each offense for which the defendant is convicted.

**ARMS EXPORT CONTROL ACT**

102.   Pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461(c), a defendant who is convicted of one or more of the offenses set forth in Counts 1, 2 and 11 through 13 shall forfeit to the United States the following property:

a.   Any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the

violations of Title 22, United States Code, Section 2778, for which the defendant is convicted.

b.   A sum of money equal to and representing the amount of proceeds obtained as a result of each offense for which the defendant is convicted.

**ESPIONAGE ACT**

103.   Pursuant to Title 18, United States Code, Section 794(d), a defendant who is convicted of one or more of the offenses set forth in Counts 6 through 8 shall forfeit to the United States the following property:

a.   Any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the violations of Title 18, United States Code, Section 794, for which the defendant is convicted.

b.   Any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of said violation[s].

c.   A sum of money equal to and representing the amount of proceeds obtained as a result of each offense for which the defendant is convicted.

104.   Pursuant to Title 18, United States Code, Section 793(h)(1), a defendant who is convicted of one or more of the

offenses set forth in Counts 3 through 5, and 9 through 11, shall forfeit to the United States the following property:

a.   any property constituting, or derived from, any proceeds obtained, directly or indirectly, from any foreign government, or any faction or party or military or naval force within a foreign country as a result of the violations of Title 18, United States Code, Section 793, for which the defendant is convicted.

b.   A sum of money equal to and representing the amount of proceeds obtained as a result of each offense for which the defendant is convicted.

## SUBSTITUTE ASSETS

105.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), a defendant shall forfeit substitute property, up to the value of the amount described in paragraphs 101 through 104, if, by any act or omission of the defendant, the property described in paragraphs 101 through 104, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

-51-

All in accordance with Title 18, United States Code, Sections 981 and 982, Title 28, United States Code, Section 2461(c), and Rule 32.2(a), Federal Rules of Criminal Procedure.

DATED:  October  25 , 2007, at Honolulu, Hawaii.

A TRUE BILL

    /s/ Foreperson
FOREPERSON, GRAND JURY

EDWARD H. KUBO, JR.
United States Attorney
District of Hawaii

ELLIOT ENOKI
First Assistant U.S. Attorney

KENNETH M. SORENSON
Assistant U.S. Attorney

ROBERT E. WALLACE JR.
Senior Trial Attorney
Counterespionage Section
  National Security Division